IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JILL R. SCOTT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:06CV576-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Jill R. Scott brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

On May 27, 2004, plaintiff filed an application for disability insurance benefits and supplemental security income. On June 23, 2005, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on January 25, 2006. The ALJ concluded that plaintiff suffered from the severe impairments of multiple sclerosis, history of mitral valve prolapse, and sleep apnea. (R. 13).

He found that these impairments, considered either singly or in combination, did not meet or equal the severity of any of the impairments in the "listings," and that plaintiff was not able to perform her past relevant work as a vice president of a flooring business and phone consultant. However, he concluded that she retained the residual functional capacity to perform light work and, considering her age, education and work experience, that a finding of "not disabled" is directed by Medical Vocational Rule 202.21. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

At step five of the sequential evaluation, the ALJ must determine whether, "in light of 'residual functional capacity,' age, education, and work experience the claimant can perform other work. The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002)(citations omitted). Where the claimant has nonexertional limitations, an ALJ may not rely exclusively on the grids to support a step five conclusion that there are other jobs available in significant numbers in the national economy that the claimant is able to perform, but must also rely on independent evidence, preferably the testimony of a vocational expert. Id. In the present case, the ALJ supported his step five decision exclusively by resort to the medical-vocational rules ("the grids").

In a disability report filed on October 27, 2004, plaintiff indicated, *inter alia*, that she has a lesion on her optic nerve which affects her vision. (R. 81-82). In February and March of 2002, plaintiff complained to Dr. Strong, the physician treating her multiple sclerosis, that she experienced blurred vision every other day to every few days, lasting from a couple of hours to a day at a time. (R. 177-78). On April 20, 2002, plaintiff was hospitalized for three days for a multiple sclerosis exacerbation after she reported to Baptist-Montclair Medical Center complaining that she was experiencing visual blurring and distorted vision upon left

gaze. (R. 170-74). On November 6, 2002, plaintiff told Dr. Strong that, for the previous few days, she had experienced constant difficulty in focusing either eye. (R. 155). Three months later, on February 6, 2003, she told Dr. Strong that, for several weeks, she had experienced a hard time focusing either eye and diplopia (double vision). She also reported that "[f]or a while," she had "a black spot in her right eye." (R. 151). Dr. Strong noted that "after her last visit, she had visual evoked potentials which showed difficult-to-interpret studies due to bifid wave forms bilaterally, and on the right probably reproducible results[1] that were worrisome for slowing in both eyes." (R. 151). On November 22, 2003, plaintiff went to the Baptist-Montclair emergency room. Her complaints included diplopia. (R. 244). Dr. Strong's treatment notes from an office visit on February 22, 2005 indicate that plaintiff complained of double vision for the previous six days and that, at the time of the office visit, the "double vision is much better. It is still present, but it is not as wide apart." (R. 351). During this visit, plaintiff told Dr. Strong that she had not been back for treatment "because she lost her insurance." (Id.). Dr. Strong planned to treat her double vision with two days of IV Solumedrol and, if that did not work, then a Medrol Dose Pack. (Id.) He also indicated that he would try to "get her into the Referral Clinic so that we can get a workup done." (Id.).

The ALJ concluded that plaintiff suffers from the severe impairment of multiple sclerosis. The ALJ discredits plaintiff's testimony of disabling symptoms first by noting that "while the claimant was routinely treated for relapsing and remitting multiple sclerosis, the medical record does not demonstrate that she was ever hospitalized for multiple sclerosis."

---

[1] Dr. Strong may have intended to write "poorly reproducible results." (See VEP report, R. 197).

(R. 12). However, as noted above, plaintiff was hospitalized for three days in April 2002 for exacerbation of her multiple sclerosis. (R. 170-74). The ALJ correctly notes that a 72-hour ambulatory electroencephalogram[2] revealed normal results with no evidence of seizure activity. The ALJ then states:

> Although the claimant can reasonably be expected to experience some weakness, she has routinely demonstrated good muscle and grip strength. On examination with Dr. Strong, she demonstrated 5 out of 5 strength in all muscle groups tested. (Exhibit 4F). Similarly, she exhibited full range of motion in all upper and lower extremity joints with muscle strength and grip strength measured as 4 out of 5 during her examination with Dr. Matic. She was also able to perform heel and toe walk and squat and rise. (Exhibit 10F).

(R. 12).

The ALJ did not acknowledge, at any point in his decision, that plaintiff complained of vision problems. (See R. 9-14, 81). Even assuming that the reasons the ALJ articulated for discounting plaintiff's complaints of disabling fatigue are adequate for that purpose, they do not provide a sufficient basis for rejecting plaintiff's complaints of problems with her vision. While the ALJ was free to reject those complaints – with an adequate explanation of his reasons for doing so – the court is unable to determine from the decision that the ALJ even considered plaintiff's allegation of vision problems.

Additionally, during the period under consideration, plaintiff was twice hospitalized for psychiatric treatment – once for two weeks during April and May 2001 and the second time for a few days in June 2003. The discharge diagnosis from the first admission was

---

[2] This test was performed in August 2001, three and a half months after plaintiff's alleged onset date. (R. 187).

major depression; from the second admission the diagnosis was dysthymia.[3] (R. 88-93; R. 268-73). From May 2001 through June 2003, plaintiff was treated by Dr. Thomas LeCroy, a psychiatrist, who prescribed psychiatric medications. (R. 313-19). After a consultative examination conducted on July 24, 2004, psychologist Robert J. Kline, Ph.D., diagnosed plaintiff with "Major Depressive Disorder which may be under fairly good control when she is taking her full complement of medications." (R. 322). He stated:

> She indicated that since she has been out of Prozac and her other medications have been basically cut in about half, that she is not doing nearly as well as she used to. . . . I would place her GAF at 50 at this time. The prognosis is fair. Effort and motivation were adequate. The medical evidence in the records provided by the DDS was reviewed and those findings were considered in the overall assessment of the patient. She can manage financial benefits. Her ability to function independently and her ability [to] understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers, and work pressures in a work setting would probably not, in and of itself, preclude her from being able to hold a job. However, the other issue is that she is not taking but a small amount of the medications for her psychiatric problems. If she could get back on her full complement of medications, then, she may do much better.

(R. 322-23).[4]    After reviewing the medical evidence, Gloria Roque, Ph.D. –  a non-

---

[3] In adults, "[t]he essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years[.]" DSM-IV-TR (4th ed.) at p. 376.

[4] In the "history" section of his report, Dr. Kline stated:

She reported that she is supposed to be taking Seroquel, 25 mg. four times a day but she has not had a supply of those so she is only taking two a day. She is also supposed to be taking Klonipin but has cut back on that supply and is currently taking two tablets per day. She is completely out of Prozac and out of Neurontin. She also takes some other medications such as Pepsid, Lipitor, and Topramax. She proceeded to tell me that the last time she saw Dr. Lecroy was about the beginning of the year. She said that he writes prescriptions for her for six months. She said she has four refills left. I pointed out that six months has passed and that she

examining state agency medical consultant – determined that plaintiff had moderate functional limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence, or pace, and that she had experienced on or two episodes of decompensation of extended duration. (R. 336; see also R. 339-40, Mental RFC Assessment).

The ALJ concluded that, "while the claimant does have a medically determinable psychiatric impairment, *with the proper use of medication*, such impairment would have only a minimal effect, if any, on her ability to perform basic work-related activities" and, therefore, that "the claimant does not have any severe mental disabilities." (R. 11-12)(emphasis added). The ALJ acknowledged plaintiff's report that "she did not have the money to get her prescriptions refilled," (R. 11), but did not conduct any inquiry regarding whether plaintiff could actually afford the medication or obtain it at low or no cost from alternate sources.[5]

---

> shouldn't have any refills left on her prescriptions. She said that she has been getting some samples from another doctor. Consequently, it appears that she has not been taking her psychotropic medication on any kind of a regular basis, at least, any time recently. She seemed to imply that the reason she has not been able to take her medication is that she hasn't had the money to get her medications refilled. When asked how the medications work, she said that they work well when she can get her full dosage.

(R. 320). When Dr. Kline asked plaintiff what symptoms she was having since she could not take her full dosage, she reported depression, sleeping fifteen to sixteen hours, a forty pound weight loss, low energy level, diminished pleasure in life, crying spells once a day, and periodic suicidal ideation. (Id.).

[5] The Commissioner argues that plaintiff told to the consultative examiner that she had obtained samples from a doctor. However, in the same discussion, plaintiff reported that she did not take her full complement of prescribed medications because she was unable to afford it.

Dr. Kline, the consultative examiner, assigned a GAF score of 50, which indicates serious symptoms or serious impairment in social or occupational functioning. (See DSM-IV-TR (4th ed.) at p. 34). Dr. Roque, the agency's medical consultant, determined that plaintiff has moderate limitations in a number of areas. There is no medical evidence to support a conclusion that – *without* taking all of her medications as prescribed – plaintiff does not suffer from any significant non-exertional limitations as a result of her mental impairment. The ALJ's implicit conclusion that plaintiff suffers from no non-exertional mental functional limitations (so as to permit exclusive reliance on the "grids") depends on his finding of noncompliance and, thus, the finding of no disability is "inextricably tied to the finding of noncompliance." See Dawkins v. Bowen, 848 F.2d 1211, 1214 (11th Cir. 1988).[6] Absent an adequately supported determination by the ALJ regarding whether or not plaintiff is, in fact, unable to afford the prescribed medication, the court cannot conclude that

---

[6] In Dawkins, the court stated:

> We agree with every circuit that has considered the issue that poverty excuses noncompliance. See, *e.g.,* Lovelace [v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987)] ("To a poor person, a medicine that he cannot afford to buy does not exist"); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986)(failure to follow prescribed treatment does not preclude reaching the conclusion that a claimant is disabled when the failure is justified by lack of funds); Dover v. Bowen, 784 F.2d 335, 337 (8th Cir. 1986)("the ALJ must consider a claimant's allegation that he has not sought treatment or used medications because of lack of finances")' Teter v. Heckler, 775 F.2d 1104, 1107 (10th Cir. 1985)(inability to afford surgery does not constitute an unjustified refusal and does not preclude recovery of disability benefits). Thus while a remediable or controllable medical condition is generally not disabling, when a "claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." Taylor v. Bowen, 782 F.2d 1294, 1298 (5th Cir. 1986)(footnote omitted).

Dawkins, 848 F.2d at 1213.

the ALJ's decision is supported by substantial evidence.  Id.[7]

Plaintiff's allegations of visual limitations and limitations caused by depression, if credited, would not necessarily dictate a finding of disability.  They would, however, preclude use of the grids as the exclusive support for the ALJ's step five determination. Because the ALJ failed to articulate any reason for rejecting plaintiff's complaints of vision limitations (if he considered them), and because the ALJ's determination that plaintiff's mental impairment causes no more than minimal functional limitations depends on plaintiff's noncompliance (without a finding that the noncompliance was not justified), the ALJ's step five finding is not supported by substantial evidence.[8]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be REVERSED and this action REMANDED for further proceedings consistent with this opinion.  A separate judgment will be entered.

Done, this 9th day of August, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

---

[7] The ALJ's determination that plaintiff's medically determinable psychiatric impairment is not "severe" – i.e., that it does not have more than a minimal effect on plaintiff's ability to perform work-related activities – depends on her "proper use of medication." (R. 11-12). However, the court notes that functional limitations caused by even non-severe impairments must be considered in assessing residual functional capacity.  See 20 C.F.R. 404.1545(e).

[8] Additionally, the plaintiff has presented "a colorable claim of mental impairment" and the ALJ has failed to use the "'special technique' dictated by the PRTF for evaluating mental impairments." Moore v. Barnhart, 405 F.3d 1208, 1213-14 (11th Cir. 2005).